**GEIGY CHEMICAL CORPORA-
TION et al.**

v.

**UNITED STATES.**

**R.D. 11775; Reappraisement R66/10120–S,
R65/16280 and R65/20992.**

United States Customs Court.
May 8, 1973.

Busby, Rivkin, Sherman, Levy & Rehm, New York City (Saul L. Sherman, New York City, of counsel), for plaintiff Geigy Chemical Corp.

Barnes, Richardson & Colburn, New York City (Hadley S. King, James S. O'Kelly and James H. Lundquist, New York City, of counsel), for plaintiff Sandoz, Inc.

George Bronz, Washington, D. C., for plaintiff Ciba Chemical & Dye Co.

Harlington Wood, Jr., Asst. Atty. Gen. (Andrew P. Vance, Bernard J. Babb, and James Caffentzis, New York City, trial attorneys), for the defendant.

WATSON, Judge:

These three appeals for reappraisement were the subject of a joint trial. The merchandise involved consists of dyestuffs of benzenoid origin imported from Switzerland in 1965. The central issue in the case involves the calculation of the United States value of these importations, in particular the correct allowance to be made for profit and general expenses to be deducted from the United States price of such merchandise. The relevant portion of the Tariff Act of 1930 reads as follows:

Section 402(c) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

(c) *United States value.*—For the purposes of this section, the United States value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal market of the United States for domestic consumption, packed ready for delivery, in the usual wholesale quantities and in the ordinary course of trade, with allowances made for—

(1) any commission usually paid or agreed to be paid, or the addition for profit and general expenses usually made, in connection with sales in such market of imported merchandise of the same class or kind as the merchandise undergoing appraisement;

A commendable series of stipulations between the parties, as well as subsequent developments, served to eliminate factual issues in the case. Attention has thereby been focused on the legal issue of how the usual "addition, for profit and general expenses" should be determined under the facts and circumstances of this case. In this connection, the defendant relies heavily on the provisions of section 402(g) of the Tariff Act of 1930, as amended, *supra*, the relevant portion of which reads as follows:

(g) *Transactions between related persons.*

(1) For the purposes of subsection (c)(1) or (d) of this section, as the case may be, a transaction directly or indirectly between persons specified in any one of the subdivisions in paragraph (2) of this subsection may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise of the same general class or kind as the merchandise undergoing appraisement. If a transaction is disregarded under the preceding sentence and there are no other transactions available for consideration, then, for the purposes of subsection (d), the determination of the amount required

to be considered shall be based on the best evidence available as to what the amount would have been if the transaction had occurred between persons not specified in any one of the subdivisions in paragraph (2).

(2) The persons referred to in paragraph (1) are.

\* \* \* \* \* \*

(E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting stock or shares of any organization and such organization; \* \* \*

The stipulation of the parties reads as follows:

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the parties hereto, subject to the approval of the Court, that:

1. This is to be considered as the only stipulation relating to the submission of this case and supersedes any previous partial stipulations.

2. The three above-captioned cases, having common issues of law and fact, are hereby consolidated for all purposes. All evidence presented in any of the cases by any party thereto shall be a part of the record in each of the above-captioned cases, hereinafter respectively referred to as "the Geigy case" (R66/10120–S), "the Sandoz case" (R65/16280), and "the Ciba case" (R65/20992), and collectively referred to as "the three consolidated cases."

3. The subject merchandise in the Geigy case is limited to "Solophenyl Brown BGL 100%" which was exported from Switzerland to the United States on or about November 3, 1965. The subject merchandise in the Sandoz case is limited to "Artisil Red FL granules 100%" which was exported from Switzerland to the United States on or about May 26, 1965. The subject merchandise in the Ciba case is limited to "Cibalan Brilliant Scarlet RL 43%" which was exported from Switzerland to the United States on or about June 11, 1965. The

subject merchandise in each of the three consolidated cases:

a) is a coal tar dye,

b) is a benzenoid chemical product described in Headnote 4 of Schedule 4, Part 1, of TSUS.

c) is not a product enumerated on the Final List (T.D. 54521).

d) was advisorily classified by the Appraiser at the rate of 40% ad valorem, under Item 406.50, TSUS,

e) was manufactured or produced in Switzerland,

f) is of the same class or kind, and

g) is of the same class or kind as the merchandise imported by Carbic-Hoechst Corporation upon which the appraisement is in part based.

At the time of exportation of the subject merchandise in each of the three consolidated cases, there was no similar competitive article manufactured or produced in the United States.

4. The merchandise which is the subject of each of the three consolidated cases was appraised on the basis of United States value under Section 402(c) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, computed as follows:

a) a stated price per pound, less 1% cash discount, which the Appraiser found was the price at which such merchandise was freely sold in the principal market of the United States for domestic consumption, packed ready for delivery, in the usual wholesale quantities and in the ordinary course of trade, at the time of exportation of the subject merchandise to the United States;

b) less 19.1%, which the Appraiser concluded was "the addition for profit and general expenses usually made, in connection with sales in such market of imported merchandise of the same class or kind" within the meaning of Section 402(c)(1);

c) less an amount per pound, which the Appraiser found was the usual cost of transportation and insurance incurred with respect to such merchandise from

the place of shipment to the place of delivery;

d) divided by 1.40, which the Appraiser found was the correct amount by which the value should be reduced, pursuant to Section 402(c)(3), to allow for customs duty payable on such merchandise.

The respective dollar amounts and computations adopted by the Appraiser in each of the three consolidated cases were as follows (the parenthetical letters correspond to the subparagraphs above):

| | Geigy Case | Sandoz Case | Ciba Case |
|---|---|---|---|
| a) Selling Price per pound, less 1% Cash Discount | $5.3064 | $4.2075 | $5.6430 |
| b) Less 19.1% Allowance for Profit and General Expenses | 1.0135 | .8036 | 1.0778 |
| | 4.2929 | 3.4039 | 4.5652 |
| c) Less Transportation and Insurance | .0679 | .07 | .0703 |
| | 4.2250 | 3.3339 | 4.4949 |
| d) Divided by 1.40 to allow for Customs Duty = Appraised (United States) Value | 3.0179 | 2.3814 | 3.2106 |

5. The unit prices, packed, of the subject merchandise (duly converted to dollars) were, respectively:

| Geigy Case | Sandoz Case | Ciba Case |
|---|---|---|
| $2.3389 | $1.7699 | $2.7967 |

6. The only element of the Appraisers' computation with which the plaintiffs disagree is the amount deducted for profit and general expenses as set forth above. The parties agree that if the correct amounts of such deductions are other than those allowed by the Appraiser, the deductions for customs duty must be adjusted.

7. At the time of exportation of the instant merchandise, there were only four companies selling in the United States merchandise of the same class or kind within the meaning of Section 402(c)(1) which had been exported from Switzerland, each of them a corporation organized under the laws of one of the States of the United States:

a) Carbic Color Division of American Hoechst Corp. ("Carbic")—formerly known as Carbic-Hoechst Corporation, and before that as Carbic Color and Chemical Co., Inc.—which imported such Swiss merchandise only from Durand & Huguenin, S.A.

b) Ciba Chemical & Dye Company ("Ciba") a division of Ciba Corporation, formerly Ciba Company, Inc., which imported such Swiss merchandise only from Ciba Limited.

c) Geigy Chemical Corporation ("Geigy"), which imported such Swiss merchandise only from J. R. Geigy, S.A., and

d) Sandoz, Inc. ("Sandoz"), which imported such Swiss merchandise only from Sandoz, Ltd.

Carbic was not related to its Swiss supplier in any of the respects mentioned in Section 402(g)(2), while Ciba, Geigy and Sandoz were so related in that they were each wholly owned subsidiary corporations of their respective Swiss suppliers.

8. In determining the amount of general expenses incurred by the plaintiff companies in the sale in the United States of the imported products which are the subject of this lawsuit, each of the plaintiffs applied the following accounting method which was recommended by a firm of independent certified public accountants:

a) The first classification of expenses consists of those expenses which may be attributed directly to the particular class of products to which they relate. Examples of such expenses are ocean freight and marine insurance which relate to imported products. Such expenses were charged directly to the applicable class of product.

b) The second classification consists of those expenses which relate to the physical handling of the products, and which tend to vary directly with quantities of products sold, rather than with the value of such products. Examples

of such expenses are shipping and warehousing expenses, including those salaries, depreciation and rent directly related thereto. These expenses were allocated on the basis of the weight of products sold.

c) The third classification consists of the remaining expenses, of which the principal items would be salesmen's salaries and commissions, other salaries and wages including general and administrative salaries, travel and entertainment expenses and advertising. These expenses were allocated on the basis of the dollar value of products sold.

The following figures, covering the calendar year 1964, which the parties agree is a reasonable period preceding the instant importations, represent the profit and the general expenses of each of the three plaintiff companies with respect to merchandise of the class or kind here involved (computed as a percentage of their net selling prices in the United States), as determined in compliance with the above method:

|  | Net Profit | General Expenses | Gross Profit |
|---|---|---|---|
| Geigy | 11.2% | 22.2% | 33.4% |
| Sandoz | 10.1% | 19.8% | 29.9% |
| Ciba | 7.4% | 19.2% | 26.6% |

In stipulating that these figures were accurately determined in accordance with the accounting method of the firm of independent certified public accountants, as set forth above, defendant does not concede that such principles and recommendations constitute a proper method under the applicable provisions of the tariff laws for the computation of general expenses and net profit.

9. The respective percentages of all sales in terms of dollars, in the United States, of merchandise of Swiss origin of the class or kind here involved for the calendar year 1964 were as follows:

| | |
|---|---|
| Geigy | 37.8% |
| Sandoz | 31.4% |
| Ciba | 23.2% |
| Carbic | 7.6% |
| | 100.0% |

10. The profit and general expenses of Carbic for the 1964 calendar year with respect to merchandise of the class or kind here involved were found by the Appraiser to be as follows:

|  | Net Profit | General Expenses | Gross Profit |
|---|---|---|---|
| Carbic | 5.0% | 14.1% | 19.1% |

In stipulating that the Appraiser so found, the plaintiffs do not concede that such finding was correct.

11. In making the allowance for profit and general expenses specified in paragraph 4(b) above, the Appraiser, because the relationship between Geigy, Sandoz and Ciba, and their respective parent companies was such as is described in Section 402(g)(1), found that their profits and general expenses did "not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise of the same general class or kind as the merchandise undergoing appraisement," disregarded their profits and general expenses for purposes of determining the proper allowances to be made under Section 402(c)(1), and based his allowance on the profits and general expenses of Carbic. Having found for the aforesaid reasons that the profits and general expenses of Geigy, Sandoz, and Ciba did not fairly reflect the amount usually reflected in the market under consideration of merchandise of the same class or kind as the merchandise undergoing appraisement, the Appraiser did not determine the accuracy of the submissions by Geigy, Sandoz, and Ciba with regard to general expenses and profit.

12. The gross profit (i. e., general expenses plus net profit) of merchandise of the same class or kind as here involved within the meaning of Section 402(c)(1) sold in the United States by the plaintiff companies in the years 1958 through 1964, expressed as a percentage of net selling prices, is for the purposes of this

litigation but not for any other purpose, deemed to be as follows:

| | Ciba | Geigy | Sandoz |
|------|------|-------|--------|
| 1958 | 23.5 | n.a. | 38.3 |
| 1959 | 25.7 | 34.4 | 38.1 |
| 1960 | 25.3 | 34.7 | 35.8 |
| 1961 | 24.2 | 33.9 | 34.0 |
| 1962 | 25.5 | 34.9 | 34.0 |
| 1963 | 26.7 | 34.6 | 32.6 |
| 1964 | 26.6 | 33.4 | 29.9 |

In stipulating to these figures and not contesting their accuracy for the purpose solely of this litigation, defendant does not concede or stipulate their accuracy for any other litigation and does not waive objection to the relevancy of these figures in this litigation.

13. All merchandise of the class or kind here involved sold in the United States by the plaintiff companies has been sold at all relevant times to purchasers who had none of the relationships to the plaintiffs specified in Section 402 (g)(2). None of the general expenses of the plaintiff companies, as set forth in paragraph 8 above, represent payments to or transactions with their respective parent companies or any other related companies; except that Geigy incurred $2010 of such expenses in payments to its parent company, or 0.00082 (0.082%) of its net selling price in the United States of merchandise of the class or kind here involved; Sandoz incurred $1612 of such expenses in payments to its parent company, or 0.00079 (0.079%) of its net selling price in the United States of merchandise of the class or kind here involved; and Ciba incurred $3812 of such expenses in payments to its parent company, or 0.0025 (0.25%) of its net selling price in the United States of merchandise of the class or kind here involved. (For computation of these expense figures, see Appendix A, annexed hereto and incorporated herein by reference.)

14. All entry papers, including submission sheets and invoices pertaining to the instant entries, shall be deemed to be in evidence.

Dated: New York, New York
April 1, 1971

BUSBY RIVKIN SHERMAN and LEVY

By Saul L. Sherman
    Attorneys for Plaintiff
    Geigy Chemical Corporation

BARNES, RICHARDSON & COLBURN

By Hadley S. King
    Attorneys for Plaintiff
    Sandoz, Inc.

GEORGE BRONZ

    George Bronz
    Attorney for Plaintiff
    Ciba Chemical & Dye Co.

L. PATRICK GRAY, III
Assistant Attorney General
Civil Division

By    Andrew P. Vance
    Andrew P. Vance
    Chief, Customs Section

SO ORDERED:

    James L. Watson
        Judge

## EXHIBIT A
### SANDOZ

During the year 1964, Sandoz made payments to its parent company, Sandoz, Ltd., Basle, Switzerland, for certain expenses which were charged either directly to the Dyestuffs Division of Sandoz where possible or indirectly by allocation to such Division where necessary. A portion of these expenses were, thereafter, allocated to noncompetitive new law dyestuffs and were included in the selling and administrative expenses of such dyestuffs.

The payments to Sandoz, Ltd. in 1964 were for the following items: (a) shade cards which were used by Sandoz salesmen to demonstrate to customers the various colors and shades of dyestuffs sold by Sandoz; (b) diaries which are distributed to the trade for advertising and promotional purposes; (c) incidental miscellaneous expenses for technical assistance supplied by personnel of Sandoz, Ltd., and (d) directors' fees.

The payments to Sandoz, Ltd. in 1964 aggregated $21,445.00, of which $13,375 was charged to the Dyestuffs Division. Of the amount charged to the Dyestuffs Division, $1,612 was allocated as an expense item to noncompetitive new law dyestuffs. The following are the details of the charge and allocation of these payments:

| Expense Item | Total Disbursement to Sandoz, Ltd. | Charged to Dyestuffs Division | | Allocated to Noncompetitive New Law Dyestuffs |
|---|---|---|---|---|
| | | Percent | Amount | |
| Shade cards | $ 6,252 | 100 | $ 6,252 | $ 753 |
| Calendars and diaries | 4,893 | 72 | 3,523 | 425 |
| Miscellaneous | 300 | 100 | 300 | 36 |
| Directors' fees | 10,000 | 33 | 3,300 | 398 |
| Total | $21,445 | | $13,375 | $1,612 |

In each instance where allocation of these expenses became necessary the allocations were made on the basis of sales dollars.

### GEIGY

The only item of general expense included in the Geigy cost figures in paragraph 8 of the stipulation which constituted payments to J. R. Geigy S.A., the parent company of Geigy, represents the allocable portion of the cost of calendars distributed by Geigy as Christmas presents, the relevant figures being as follows:

| | Total Payments to Parent | Allocable to Dyestuffs Division | Allocable to non-competitive non-final list Dyestuffs |
|---|---|---|---|
| | | (a) | (b) |
| Calendars | $135,907.42 | $4,919.58 | $2,010.06 |

(a) Allocated directly on the basis of the actual number of calendars distributed by the Dyestuffs Division.

(b) Allocated on a sales dollar basis within the Dyestuffs Division.

There were no expenses paid by Geigy in 1964 to any other related companies in connection with non-competitive, non-final list dyestuffs.

The $2,010.06 thus allocated to the products in question represents 0.00082 (or 0.082%) of the net selling price of such products during 1964.

## CIBA

The only item of general expense included in the Ciba Corporation figures in Paragraph 8 of the stipulation which constitutes payments to Ciba Limited, the parent company of Ciba, represents the allocable portion of a payment of $65,000 made for research activities. All of this $65,000 was charged to Ciba Chemical & Dye Company (Ciba Corporation's dyestuffs division). Of this amount, the charge allocated to noncompetitive, nonfinal list, new law dyestuffs was $3,812, the allocation to this class of dyestuffs having been made on the basis of sales dollars.

———◆———

At the trial, the cogent and uncontradicted testimony of plaintiffs' expert witnesses on the subject of accounting established beyond doubt that the accounting method outlined in paragraph 8 of the stipulation is a proper method for the computation of the profits and general expenses of the involved companies.[1] In retrospect, I regret that the propriety of this method was not also the subject of a stipulation between the parties and I must deplore the fact that a trial was made necessary at all.

In any event, at this stage, the only issues remaining are legal ones centering on the question of what was the correct amount to deduct from the United States selling price of the imported merchandise, which amount should ordinarily be the addition for profit and general expenses usually made in the united States market in connection with sales of imported merchandise of the same class or kind.

As is set out in paragraph 11 of the stipulation, the appraiser, in finding what was the usual profits and general expenses in the United States market, disregarded the profits and general expenses of the three importers herein. He did so on the ground that the relationship between them and their European parent companies was such as is covered by section 402(g)(2)(E), that is to say, they were wholly owned subsidiaries.

█ I consider this act to have been entirely erroneous. First, the transactions which were disregarded in this case were not "transactions directly or indirectly" between persons specified in any of the subdivisions of section 402(g)(2) for the simple reason that the transactions in the United States market were between unrelated companies. This being the case, section 402(g)(1) is inapplicable to the situation prevailing in the case at bar and cannot serve as justification for disregarding elements derived from sales between unrelated companies. Since plaintiffs herein sold in the United States to unrelated companies, if United States value is to be the basis of appraisement, their transactions ought to be given consideration in arriving at said value. If their experience is to be disregarded, it ought not to be done pursuant to a provision which speaks to transactions between related parties but rather ought to arise from demonstrable defects in the transactions under scrutiny, namely, the sales in the United States to unrelated buyers. Second, the transactions between the importers and their parent companies were not transactions in the "market under

---

1. See also Accountants' Handbook, Section 9, pages 31–33 (The Ronald Press Company, New York 1963).

consideration". The latter phrase in section 402(g) explicitly directs attention, in the matter of United States value, to the transaction in the United States domestic market. If disqualifying circumstances exist sufficient to warrant ignoring the profits and general expenses of firms in the United States market, these circumstances ought to be present by reason of a relation between the buyer and seller in the United States market. In this case, the buyers and sellers were completely unrelated and the transactions between them provide no cause for ignoring the associated general expenses and profits.

█ This is directly analogous to the reasoning in Brown, Alcantar & Brown, Inc., et al. v. United States, 69 Cust.Ct. ——, A.R.D. 306 (1972), in which the court stated as follows:

The "market under consideration" must refer to the export market in the case of constructed value. The neutral tone of the phrase was undoubtedly used because section 402(g) applies both to constructed value (in which instance the export market is considered) and United States value (in which instance the United States domestic market is considered). Under these circumstances, the original *determination which discredits a constructed value must arise from conditions in the export market.* * * * [Emphasis supplied.]

Third, even were there a corporate relationship between buyer and seller, in the United States market, that alone would not be sufficient to justify ignoring the expense and profit consequences of transactions between them. Here again section 402(g) clearly indicates it is not the mere existence of a relationship but the further finding that the profits and general expenses of the related companies do not fairly reflect the amount usually reflected in such sales. Only the latter finding would permit the appraising official to ignore the amounts in question. There is no indication whatsoever in the record of this case that anything beyond the bare relation of the importers to their European parents was considered by the appraising official.

The facts of this case clearly establish that the plaintiffs herein possessed the lion's share of the United States market. Stipulation number 9, showing the percentages of dollar sales, indicates that Geigy's sales represented 37.8% of the market to 31.4% for Sandoz, 23.2% for Ciba and 7.6% for Carbic. In light of this division of the market, it would defy common sense to consider the experience of Carbic as that which is "usual" for the market in question. Nor will I discredit the experience of the firms with the larger shares of the market in the absence of specific discrediting evidence.

█ In this connection, it should be noted once again that the presumption of correctness attaching to the actions of the appraising official attaches only to those acts which he is known to have performed and not to those which he might have performed. See, A. Zerkowitz & Co., Inc. v. United States, 58 CCPA 60, C.A.D. 1005, 435 F.2d 576 (1970). In this case it is known only that the experience of the plaintiffs was disregarded because of their relationship to their European parents and a presumed finding that their elements of general expenses and profits did not reflect those usual in the United States market. The matter of relationship, by itself, has been shown to be irrelevant to a determination of value in the United States market and the facts concerning what is "usual" in that market are dictated by the stipulated facts concerning the shares of the market. The presumed finding of the appraising official is inconsistent with the stipulated fact that plaintiff, Geigy, dominated the market with a 37.8% share of sales. There is no presumption that the experience of Geigy was tainted by any improper manipulations and contrivance between it and its parent company. In other words, the presumption of correctness of a finding of United States value carries with it no presumptions as to prior transactions between the importer and its supplier. These prior circumstances must be the subject of specific proof by the

party seeking to benefit from their revelation. In this case, the defendant has adduced no proof of any untoward circumstances in the sales between the importers and their parent company suppliers. On the contrary, plaintiffs, as a safeguard, have proven by affidavits from the parent company suppliers that their parents' profits in Europe exceeded those of the supplier of Carbic. This effectively nullifies defendant's insinuation that the transactions between the plaintiffs and their parents were somehow contrived to reduce general expenses and profit in Europe and enlarge them in the United States. Such allegations, made without proof of any sort, and in the face of evidence tending to a directly opposite conclusion, are without force and effect.

There is not a single factor in this case which supports the action of the appraising official while there is substantial evidence supporting the position taken by the importers.

■ It should be apparent that what is usual in a market is that which is the experience in the largest segment of the market or in that portion of the market which sells the greatest quantity of the merchandise in question. The court is particularly well informed on this point having before it an agreement as to the market shares of all those selling the merchandise involved in the American market during the period in question. This agreement indicates that Geigy possessed a 37.8% share of the market, a share larger than that of any other firm. In the absence of any countervailing consideration, this circumstance ought to warrant treating Geigy's experience as that which is "usual" in the market under consideration. Thus, if the United States value is the chosen basis of valuation, the deduction for general expenses and profit ought to be that derived from the figures of Geigy.

In this respect, I follow by analogy the reasoning of the Court of Customs and Patent Appeals in United States v. International Expediters, Inc., for Winsor & Newton, Inc., 40 CCPA 148, C.A.D. 511 (1953). In that case the appellate tribunal construed the phrase "profit which ordinarily is added" (in determining cost of production under section 402(f)(4)) as meaning the profit realized on the greatest quantity of merchandise sold. See also, United States v. C. J. Tower & Sons of Buffalo, Inc., 60 CCPA ——, C.A.D. 1079 (1972). In a similar vein is the interpretation of the term "usual wholesale quantities" in section 402(f)(5) of the Tariff Act of 1930, as amended, as the quantity in which the greatest aggregate volume of merchandise is sold.

■ In sum, it is abundantly clear that the experience of Geigy must be considered as that which was usual in the market under consideration, thus warranting a 33.4% allowance from the American selling price for profit and general expenses. Plaintiffs have decisively proven that the appraised values were improperly computed and further have fully supported their claimed values.

For the reasons expressed heretofore, I make the following findings of fact:

1. The merchandise involved herein consists of benzenoid dyes, exported from Switzerland in 1965, and entered at the port of New York.

2. At the time of exportation there were no similar competitive dyes manufactured or produced in the United States.

3. These dyes do not appear on the Final List.

4. These importations were appraised on the basis of United States value pursuant to section 402(c) of the Tariff Act of 1930, as amended, as follows:

| | Geigy | Ciba | Sandoz |
|---|---|---|---|
| (a) Selling Price per pound less 1% Cash Discount | $5.3064 | $5.6430 | $4.2075 |
| (b) Less 19.1% Allowance for Profit and General Expenses | 1.0135 | 1.0778 | .8036 |
| | 4.2929 | 4.5652 | 3.4039 |
| (c) Less Transportation and Insurance | .0679 | .0703 | .07 |
| | 4.2250 | 4.4949 | 3.3339 |
| (d) Divided by 1.40 to allow for Customs Duty = Appraised (United States) Value | 3.0179 | 3.2106 | 2.3814 |

5. The only element of the appraisement in issue is the allowance for profit and general expenses. The parties agreed that if such allowance is found to be other than that made in appraisement, the deduction for duty must also be adjusted.

6. At the time of exportation, and for a reasonable period prior thereto, all importations into the United States of Swiss dyes of the class or kind of the importations in this case were made by four companies, the three plaintiffs herein, and Carbic Color Division of American Hoechst Corp.

7. Carbic purchased its dyes from Durand & Huguenin, S.A., a Swiss corporation to which it was not related. The three plaintiffs herein, each a wholly-owned subsidiary of a Swiss manufacturer of similar name, purchased only from their respective parent companies.

8. All sales of dyes of the class or kind of the imports here in suit made by the plaintiffs herein were made to unrelated purchasers.

9. The profits and general expenses of the plaintiffs, respectively, for the year 1964, which the parties have stipulated and which I find to be a reasonable period preceding the instant importations, as calculated by an accounting method which I find to be reasonable, accurate, consistent with good accounting practice and in accord with law, were the following percentages of their respective net selling prices in the United States in the sale of merchandise of such class or kind:

|        | Profit | General Expenses | Total  |
|--------|--------|------------------|--------|
| Geigy  | 11.2%  | 22.2%            | 33.4%  |
| Sandoz | 10.1%  | 19.8%            | 29.9%  |
| Ciba   | 7.4%   | 19.2%            | 26.6%  |

10. The profit and general expenses of Carbic for this period for merchandise of such class or kind was stipulated to have been:

| | |
|---|---|
| Profit | 5.0% |
| General Expenses | 14.1% |
| Total | 19.1% |

The appraiser applied this total, 19.1% in the appraisement of the instant importation.

11. The sales of dyes of such class or kind in 1964 by the four importers were, respectively, the following percentages of the total of such sales in dollar terms:

| | |
|---|---|
| Geigy | 37.8% |
| Sandoz | 31.4% |
| Ciba | 23.2% |
| Carbic | 7.6% |

12. The appraiser disregarded the profit and general expenses of the plaintiffs solely because they were related to their Swiss suppliers.

13. The Swiss manufacturers who exported to the plaintiffs and Carbic realized profits on their sales of such dyes to the United States in 1964, in the following percentages of their sales prices:

| | |
|---|---|
| Sandoz, Ltd. | 37.6% |
| Ciba, Ltd. | 25.7% |
| J. R. Geigy, S.A. | 23.04% |
| Durand & Huguenin, S. A. | 12.3% |
| Durand & Huguenin, S.A. | 12.3% |

In light of the above I reach the following conclusions of law:

1. United States value, section 402 (c), is the proper basis for appraisement.

2. The appraiser may not apply section 402(g) to disregard the usual profit and general expenses merely because importer and exporter are related companies. In these cases, he had no other basis for disregarding the usual profit and general expenses.

3. The usual profit and general expenses in the sale of merchandise of the class or kind of the imports herein were those of Geigy, which sold the largest volume of such merchandise in the relevant period.

4. The proper computations for arriving at the value of the involved merchandise are as follows:

| | Geigy Case | Ciba Case | Sandoz Case |
|---|---|---|---|
| (a) Selling Price per pound less 1% Cash Discount | $5.3064 | $5.6430 | $4.2075 |
| (b) Less 33.4% Allowance for Profit and General Expenses | 1.7723 | 1.8843 | 1.4053 |
| (c) Less Transportation and Insurance | .0679 | .0703 | .07 |
| | 3.4662 | 3.6879 | 2.7322 |
| (d) Divided by 1.40 to allow for Customs Duty = Appraised (United States) Value | 2.4759 | 2.6342 | 1.9516 |

Judgment will be entered accordingly.